## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALIDITY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-365-SRF |
| | ) | |
| PROJECT BORDEAUX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION[1]

Presently before the court in this patent infringement action is a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), filed by defendant Project Bordeaux, Inc. ("Defendant"). (D.I. 9) The court has considered the parties' briefing and heard oral argument on August 23, 2023.[2] For the following reasons Defendant's motion to dismiss is GRANTED.

### I.   BACKGROUND

Plaintiff Validity, Inc. ("Plaintiff") brought this suit on March 30, 2023, alleging infringement of United States Patent No. 8,719,356 ("the '356 patent"), which is titled "Methods, Systems, and Computer Readable Media for Monitoring Deliverability of Electronic Email Based on Subscriber and Seed Deliverability Data." (D.I. 1) The '356 patent is generally directed to a method of monitoring the effectiveness of bulk email campaigns targeting a specific set of recipients. ('356 patent at 1:15-26) The purpose of the invention is to provide the sender of an email campaign a broader and more accurate picture of what happens to the emails after

---

[1] On June 15, 2023, the parties consented to the jurisdiction of the Magistrate Judge to conduct all proceedings in this case. (D.I. 18)

[2] The briefing and filings related to Defendant's pending motion are found at D.I. 10, D.I. 13, D.I. 14, and D.I. 16.

they are sent—whether the emails are successfully delivered to the intended recipient's mailbox, opened, read, and/or forwarded, or whether the emails are diverted to a spam folder or otherwise rendered undeliverable. (*Id.* at 1:22-2:35; 3:28-4:41; 10:3-44)

Plaintiff identifies several limitations with prior art methods of determining the success of email campaigns. One method involves the email sender creating seed email accounts which are not associated with a human user. Instead, the seed accounts are associated with different internet service providers ("ISPs") and are monitored as samples to verify if and how email campaign messages are delivered. (D.I. 1 at ¶ 25; '356 patent at 1:31-38) But a drawback of the seed data method is that it provides a statistical result based on a small sample of email addresses which are not assigned to actual human users. (D.I. 1 at ¶ 26; '356 patent at 1:38-50) As a result, this method cannot measure data associated with actual human engagement with an email account, such as adding to an address book or opening, clicking through, forwarding, or replying to an email. (*Id.*)

Another prior art method uses data from human email recipients who subscribe to the email campaign. (D.I. 1 at ¶ 27; '356 patent at 1:51-53) In this method, data from actual email recipients is obtained from ISPs regarding how the emails are categorized. ('356 patent at 1:53-59) However, there is often not enough subscriber data to provide comprehensive monitoring of the ISPs associated with the intended recipients of the email campaign. (*Id.* at 1:64-2:4; D.I. 1 at ¶ 28) Sometimes, subscriber data is fully blocked by the ISP, resulting in no available subscriber data. ('356 patent at 2:8-14; D.I. 1 at ¶ 28) And distinguishing important campaigns from a list of email campaigns is difficult when a sender receives many unimportant campaigns for evaluation. ('356 patent at 2:6-8; D.I. 1 at ¶ 28)

2

A prior art solution for identifying email campaigns set forth in U.S. Patent Publication No. 2009/0077182 ("Banjara") involved the use of special custom email message headers called x-headers which identify the sending company and the email campaign. ('356 patent at 2:15-21; D.I. 1 at ¶ 29)  The sender may ask the ISP of the email recipient whether the ISP blocked any emails with a specific x-header. ('356 patent at 2:19-23; D.I. 1 at ¶ 29)  But this method requires coordination between the email sender, the ISPs of the recipients, and a specialized email delivery services provider employed by the sender, and it cannot distinguish between emails opened by the recipient or diverted to a spam folder. ('356 patent at 2:23-30; D.I. 1 at ¶ 29)

According to Plaintiff, the '356 patent overcomes the drawbacks of a seed-only deliverability method or a subscriber-only deliverability method, thereby "achiev[ing] broader and more accurate monitoring of email campaigns." ('356 patent at 2:32-35; D.I. 1 at ¶ 30)  The patent achieves these goals by claiming a method for monitoring email campaign delivery using both subscriber and seed deliverability data to obtain a more accurate calculation of how many intended recipients actually receive and engage with the emails and, ultimately, to enhance the success of the email campaigns:



FIG. 1

('356 patent at 2:40-43 & Fig. 1; D.I. 1 at ¶¶ 31-32)

Claim 1 of the '356 patent recites:

A method for monitoring deliverability of electronic mail based on subscriber and seed deliverability data, the method comprising:

receiving at a seed deliverability storage database, seed deliverability data that includes information indicating a number of email messages associated with an email campaign that are delivered to a folder associated with one or more intended recipients of the email campaign based on a sampling of seed accounts, wherein the seed accounts are not associated with human recipients of the email campaign;

receiving at a subscriber deliverability storage database, subscriber deliverability data that includes information indicating a number of email messages associated with the email campaign that are delivered to a folder associated with the one or more intended recipients of the email campaign based on one or more subscriber accounts, wherein the subscriber accounts are associated with a subset of actual recipients of the email campaign;

determining at a processor, one or more deliverability metrics based on the seed deliverability data and the subscriber deliverability data; and

matching at the processor a subscriber campaign to a seeded campaign by determining at the processor a list of matching IDs associated with the seeded campaign and matching at the processor the matching IDs with the seeded campaign.

('356 patent, 12:5-32)

## II.    LEGAL STANDARD

Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555–56.

4

Patentability under 35 U.S.C. § 101 is a threshold legal issue which may be raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). The court is not required to individually address claims not asserted or identified by the non-moving party, so long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal quotation marks and citations omitted).

## III.   DISCUSSION

Section 101 of the Patent Act defines patent-eligible subject matter as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Laws of nature, natural phenomena, and abstract ideas are the three categories of subject matter that are not patent eligible. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The purpose of these exceptions is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm" because "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* (internal quotation marks and emphasis omitted). To transform an unpatentable concept into a patent-eligible application, "one must do more than simply state the [ineligible concept] while adding the words 'apply it.'" *Id.* at 72 (emphasis omitted).

5

In *Alice*, the Supreme Court reaffirmed the two-step framework laid out in *Mayo* for distinguishing patents that claim ineligible subject matter from those that claim patent-eligible applications of those concepts. *Alice*, 573 U.S. at 217.  First, the court must determine whether the claims are drawn to a patent-ineligible concept, such as an abstract idea. *Id.*  To do so, the court examines the focus of claim and its character as a whole. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).  In the context of claims covering computer applications, the court must consider whether the focus of the claims is on "the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016)).

If the claims are drawn to an abstract idea at step one of the analysis, the court must look to "the elements of the claim both individually and as an ordered combination" to see if there is an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18.  "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 221.  Such "additional features" are not enough to constitute an inventive concept if they are "well-understood, routine, conventional activities." *Id.* at 225.

## A.   *Alice* Step One

Defendant argues, and the court agrees, that the '356 patent claims "are directed to the abstract idea of collecting and organizing data about marketing campaigns." (D.I. 10 at 8)  Under the step one analysis, it is apparent that: (1) the claims are directed to a method of

organizing human activity; (2) the claims do not recite an improvement to computer technology; and (3) the claims are functional and do not recite how the claimed objective is accomplished. *See Epic IP LLC v. Backblaze, Inc.*, 351 F. Supp. 3d 733, 740 (D. Del. 2018).

Defendant contends that the '356 patent boils down to a method of organizing human activity that could be performed by the human mind or with pen and paper. (D.I. 10 at 8-11) Claim 1 recites the four steps of "receiving" seed deliverability data, "receiving" subscriber deliverability data, "determining" one or more deliverability metrics based on the two data sets, and "matching" a subscriber campaign to a seeded campaign by determining a list of matching IDs associated with the seeded and subscriber campaigns. ('356 patent at 12:8-32) The underlying idea of the claims is to collect, compare, and match two sets of data to determine the success of an email campaign. The idea of collecting and organizing data on communications campaigns to determine their success is a long-standing practice that can be performed by a human. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (concluding that a claim for automatic deferral and review of email messages was abstract because a similar method of sorting communications could be implemented in a brick-and-mortar post office). Although the '356 patent requires the use of a processor and storage database to perform these claimed steps, the automation of a conventional method of collecting and matching data sets does not render the claims nonabstract. *See Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.")).

The Federal Circuit has instructed district courts to compare the claims at issue to claims already found to be directed to an abstract idea in previous cases to inform the step one analysis.

7

*See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).  Here, the idea of

collecting and organizing data in this manner is plainly abstract under the Federal Circuit's

decision in *Intellectual Ventures I LLC v. Symantec Corp.*  There, the Federal Circuit concluded

that a patent reciting "receiving e-mail (and other data file) identifiers, characterizing e-mail

based on the identifiers, and communicating the characterization—in other words, filtering

files/e-mail—is an abstract idea."  838 F.3d at 1313.  Like claim 1 of the '356 patent, the

challenged claim in *Intellectual Ventures* disclosed a method of filtering e-mails that included

the steps of receiving content identifier data files, determining matching characteristics of the

identifiers using a generic processor, and providing an output of the data file characteristics

based on the preceding "determining" step.  *Id.*  The Federal Circuit compared this method to the

"long-prevalent practice for people receiving paper mail to look at an envelope and discard

certain letters, without opening them," based on certain characteristics of the mail.  *Id.* at 1314.

The fact that the '356 patent is directed to evaluating email campaigns in an inherently

technological environment does not render the claims less abstract.  *See Realtime Data LLC v.*

*Array Networks Inc.*, 556 F. Supp. 3d 424, 434-35 (D. Del. 2021) ("Regardless of whether the

asserted patents are limited to being carried out in a computational environment, they are still

directed to the type of abstract data manipulation that is not patent eligible.").

Comparable patent claims involving the collection and manipulation of data were also

found to be abstract in *Management Science Associates, Inc. v. Datavant, Inc.*, 510 F. Supp. 3d

238, 249 (D. Del. 2020).  There, the court held that the following claim language was "directed

to the abstract idea of collecting, labeling, and manipulating data" using generic computers:

> A computer-implemented method for de-identifying records received from a
> plurality of clients, each of the plurality of clients associated with a client tag
> unique to the client and a plurality of records including identifying data for a
> plurality of individuals, comprising:

8

receiving a record for an individual from at least one data storage device associated with a client, the record comprising a plurality of data elements identifying the individual;

generating, with at least one processor, a token based at least partially on the plurality of data elements and a client tag uniquely identifying the client among the plurality of clients;

creating, with at least one processor, a de-identified record comprising a portion of the record and the token;

matching, with at least one processor, the token or a new token based on the token to at least one other token in a database, the at least one other token generated based on the client tag and associated with at least one other de-identified record for the individual; and

linking, with at least one processor, the de-identified record to the at least one other de-identified record in at least one data storage device.

*Mgmt. Sci.*, 510 F. Supp. 3d at 242, 245. The court distilled this claim language into five steps in which "(1) a data record is received, (2) a token is generated based on a client token and other data elements, (3) a de-identified record is created with the token as the record's label. . ., (4) the record is matched to an existing record using the token, and (5) the two records are linked." *Id.* at 243. These steps are comparable to the steps recited in claim 1 of the '356 patent, which require receiving two sets of data, determining deliverability metrics based on the data received, and matching the two sets of data using matching IDs similar to the tokens and client tags in *Management Science*.

Like the '356 patent, the claims in *Management Science* required only the use of a generic "processor." *Id.* at 248. The court concluded that, despite the claimed use of a generic computer, the steps reciting the collection and manipulation of data could be performed in the human mind or with pen and paper and were therefore abstract. *Id.* Similarly, the recited steps in claim 1 of the '356 patent are drawn to collecting information of a particular content in two

9

data sets and matching that information using a generic processor.  ('356 patent at 12:5-32)  It is well-established that humans can follow the steps of collecting and analyzing information in their minds, and these mental processes fall within the category of abstract ideas. *Mgmt. Sci.*, 510 F. Supp. 3d at 248 (citing *Elec. Power Grp.*, 830 F.3d at 1354).

Plaintiff argues that the claims of the '356 patent are not directed to an abstract idea because the U.S. Patent and Trademark Office ("PTO") withdrew its finding that dependent claims 2, 8, 13, and 19 could not be performed by humans after the patentee amended the claims during prosecution.  (D.I. 13 at 13-14; Plaintiff's Slide 13)  Following the claim amendments, the PTO found that "a human alone cannot reasonably match subscriber campaigns associated with campaign senders '*by parsing a matching ID included in an email header*,'" and "data obtained using a plugin configured to communicate with an email program of the recipient . . . cannot reasonably [be] performed without the use of a special purpose machine."  (D.I. 14, Ex. A at 11)

Although "dependent claims can be patent-eligible even when their corresponding independent claims are patent-ineligible," the additional limitations in dependent claims 2, 8, 13, and 19 still describe an abstract method of organizing human activity. *Epic IP*, 351 F. Supp. 3d at 750.  The addition of parsing a matching ID from an email header and the use of a generic plugin do not alter the fact that these dependent claims describe the automation of a conventional method of collecting and matching data sets.  Limiting the method steps to a computational environment, such as email, does not render the dependent claims nonabstract. *See Realtime*, 556 F. Supp. 3d at 434-35.  And the court "give[s] no weight to the Patent Office's overall determination that the patent was eligible (which determination the PTO makes either expressly or impliedly for every issued patent)[.]" *Aviation Capital Partners, LLC v. SH Advisors, LLC*, C.A. No. 22-1556-RGA, 2023 WL 5333187, at *4 (D. Del. Aug. 18, 2023); *see also*

10

*Finnavations LLC v. Payoneer, Inc.*, C.A. No. 18-444-RGA, 2018 WL 6168618, at *2 n.3 (D. Del. Nov. 26, 2018) ("I am not persuaded that the prosecution history, alone, can overcome a strong showing that a patent is patent ineligible.").

Nor do the '356 patent claims recite an improvement to computer technology, such as a new memory system, a new type of virus scan, or a new type of interface that makes the computer function more accessible. *See Epic IP*, 351 F. Supp. 3d at 737 (citing cases). To be patent eligible, the claims must address "technological improvements in the way the computer systems operate, not innovations that happen to employ computers." *Id.* at 743. Here, only conventional computer components like generic processors and databases are used to implement the claimed method steps.

When asked at oral argument to identify the paragraphs of the complaint which best describe the technological solution, Plaintiff identified paragraphs 32 to 35 of the complaint. (8/23/2023 Tr.) But paragraphs 32, 33, and 35 focus on a discussion of Figure 1, which does not illustrate a specific improvement in the capabilities of a computing device and does not address the "matching" step at all:



# FIG. 1

(D.I. 1 at ¶¶ 32-33, 35; '356 patent at Fig. 1) Paragraphs 34 and 35 describe an "email monitor application" that performs the matching step, but this discussion provides no greater clarity on

how the matching IDs are determined.  (D.I. 1 at ¶¶ 34-35); *see Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) ("The claims are not focused on *how* usage of the XML tags alters the database in a way that leads to an improvement in the technology of computer databases[.]").  The cited paragraphs of the complaint, and the patent claims themselves, describe "abstract ideas implemented on computers by the use of conventional computer functionality," as opposed to "solutions that are based on an improvement in the way computers and networks perform."  *Epic IP*, 351 F. Supp. 3d at 744.

Plaintiff also relies on Figure 2 to support its position that the patent offers a technological solution.  (D.I. 13 at 4)  But Figure 2 identifies only general-purpose computer components used to collect, store, and organize data about the success of email campaigns:



FIG. 2

('356 patent at Fig. 2)  Narrative portions of the specification provide no greater specificity on the nature of the computer components.  Instead, the specification refers generically to a computer system that features "a processor (e.g., a central processing unit (CPU), a graphics processing unit (GPU) or both), one or more storage devices (e.g., a main memory and a static

12

memory) such as databases which communicate with each other via a bus." (*Id.* at 8:34-38)  The
seed and subscriber deliverability databases and the email monitor application "may include
computer-readable media on which is stored one or more sets of computer instructions and data
structures (e.g., software)[.]" (*Id.* at 8:46-50)  These excerpts describe the technology in the
broadest and most basic terms, and nothing in the written description suggests that the claims
recite improved computer technology. *See Epic IP*, 351 F. Supp. 3d at 745 (rejecting argument
that claims were directed to an improvement to technology where specification described only
conventional computer and network components to implement the inventions).

The specification of the '356 patent describes drawbacks to the prior art methods of using
either seed data or subscriber data, without linking the disadvantages of these prior art methods
to specific deficiencies in the existing technology that are cured by the claimed invention. ('356
patent at 1:64-67, 2:4-11)  The specification also describes a prior art method of identifying
email campaigns using an x-header in the email message to identify the sending company and
the email campaign. (*Id.* at 2:15-31)  The drawback of this prior art method was the need to
coordinate between the email sender, the ISPs of the recipients, and a specialized email delivery
services provider employed by the sender to distill the delivery data. (*Id.*)  But the patent does
not describe any specific technological advances that eliminate the need for such coordination.
The solution claimed in the '356 patent is not focused on "an improvement in computers as tools,
but on certain independently abstract ideas that use computers as tools." *Credit Acceptance
Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017); *see also McRO, Inc. v. Bandai
Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (considering "whether the claims
in these patents focus on a specific means or method that improves the relevant technology or are

instead directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery.").

For the first time at oral argument, Plaintiff discussed Tables 1 to 3 from the specification of the '356 patent to highlight the allegedly technological solution claimed in the patent:

**TABLE 1**

```
(?mi-xs:rpcampaign:s*?([a-z]+[\d_]{2,255})\s*?)
(?mi-xs:rpcampaign:s*?([a-z]+[\d_]{2,255})\s*?)
(?mi-xs:rpcampaign:s*?([a-z]+[\d_]{2,255})\s*?)
(?mi-six:X-campaignid:\s(C.\d+-P.\d+-S\.\d+-SS\.\d+))
(?m-six:X-Offer-ID:\s(\d+))
(?m-xis:X-Offer-ID:\s(\d+))
(?m-ixs:X-Roving-Campaignid: (\d+))
(?mi-xs:rpcampaign:s*?([a-z]+[\d_]{2,255})\s*?)
(?mis-x: x-job:\a(\d+_\d+)$)
```

('356 patent at 5:35-44)  Table 1 contains "regular expressions," or "regex," which have long been known in the computer science realm as algorithms defining patterns in text.  (*Id.* at 5:9-11); *see* Brian S. Haney, *AI Patents: A Data Driven Approach*, 19 Chi.-Kent J. Intell. Prop. 407, 447 n.305 (June 25, 2020) (citing Steven Bird, et al., *Natural Language Processing with Python* 39 (2009)); *see also* David C. Thompson, Melanie F. Wachtell, *An Empirical Analysis of Supreme Court Certiorari Petition Procedures*, 16 Geo. Mason L. Rev. 237, 298 n.247 (2009) ("Regular expressions (or simply 'regex') are a powerful search methodology that allows for searching text strings that match a certain pattern, rather than looking for an exact match.").  In other words, Table 1 shows nothing more than a tool for providing a matching function, which is not enough to capture the claims from the realm of abstraction.  *See RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("A process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data [is] directed to an abstract idea.").  The narrative portion of the specification confirms that Table 1 shows the use of regular expressions that look at email headers to determine matching IDs.  (*Id.* at 5:4-15)

14

Table 2 shows the matching IDs that are determined by the regular expressions in Table 1. (*Id.* at 5:58-67)  This "non-limiting example of various matching IDs" does not show an improvement to the functioning of a computer. (*Id.* at 5:58)  And Table 3 "is an example of the file that a data provider sends back to the system with the deliverability information / folder placement data" after the matching IDs are used to match the two files. (*Id.* at 6:33-37)  In sum, Table 3 shows the end result of the claimed steps.  The specification does not identify improvements to particular computer features; instead, it focuses on describing the result of the claimed steps.

Although Plaintiff attempted to tie these tables to the limitations in dependent claims 2 and 8 to suggest an improvement to technology, the tables add nothing to the step one considerations and instead claim the abstract result of performing a matching function.  In a recent case, the Federal Circuit considered a patent involving similar technology that recited "one or more processors" configured to perform the following steps:

> (1) identify a first and a second electronic activity (e.g., emails); (2) determine that the first electronic activity is sent or received by a certain electronic account by parsing the first electronic activity; (3) determine that the second electronic activity is sent or received by a certain electronic account by parsing the second electronic activity; (4) select a filtering policy that includes at least one of (i) a keyword policy, (ii) a regex pattern policy, or (iii) a logic-based policy; (5) apply the filtering policy and match the second electronic activity to a record object based on a "match policy;" and (7) transmit to a system of record (e.g., CRM) "instructions to store an association between the second electronic activity and the first record object in the system of record."

*People.ai, Inc. v. Clari Inc.*, 2023 WL 2820794, at *7 (Fed. Cir. Apr. 7, 2023) (quoting the patent-in-suit).  The Federal Circuit determined that the asserted claims were patent ineligible because they automated a conventional method of organizing human activity, and benefits inherent to that automation—such as improvements to speed, accuracy, and efficiency—did not amount to an improvement to technology. *Id.* (holding that the claimed system "accomplishes

15

the same ends using the same steps long undertaken by a salesperson or corporate mailroom sorting correspondence and setting aside certain correspondence for further processing and filing."). The parsing limitations, like those found in dependent claims 2 and 13 of the '356 patent, did not render the asserted claim nonabstract. *Id.* at *10 (finding that the parsing step performed by the processor in the asserted claim did not require the system to read the content of all communications to identify relevant business information).

The *People.ai* court also expressly rejected the plaintiff's argument that the specific rule-based filtering policies recited in the claim did not filter emails in the same way that the manual process had long been performed.[3] *Id.* at *8. Specifically, the Federal Circuit determined that the three claimed filtering policies (keyword policy, regex pattern policy, or logic-based policy) "*d[id] not differ from those previously used in the long-prevalent manual practice* of selecting certain communications for further processing and filing[.]" *Id.* at *9 (emphasis in original). The Federal Circuit found no improvement to computer functionality where "this improvement comes from replacing a human with a computer in that sorting procedure." *Id.*

Finally, the '356 patent claims are abstract because they are result-oriented and functional in nature, failing to articulate how the invention achieves the claimed results. *See Realtime Data LLC v. Array Networks Inc.*, 2023 WL 4924814, at *10 (Fed. Cir. Aug. 2, 2023) (holding that patents were directed to an abstract idea where they failed to explain with specificity how the inventions accomplished the claimed results). The focus of claim 1 is on receiving two sets of data, determining an unspecified deliverability metric based on those two data sets, and matching the data within the sets. ('356 patent at 12:5-32) The result-based functional language used in

_____

[3] Unlike the circumstances in *People.ai*, the claims of the '356 patent do not recite rule-based filtering policies such as regular expression pattern policies. Instead, this content is found only in the specification of the '356 patent.

claim 1 does not describe how to achieve the results in a manner that is not abstract. *See Epic IP*, 351 F. Supp. 3d at 741 (rejecting the patentability of claimed steps that were "just the barebones descriptions of a result," with "no description of any mechanism by which that result [was] obtained."). Instead, these generalized steps are performed using two generic storage databases and an undefined "processor." ('356 patent at 12:5-32); *see Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (directing courts to "look to whether the claims focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery.").

The claims of the '356 patent do nothing more than offer "a description of the problem and an announcement that it has been solved," without explaining "*how* the solution is effectuated." *Epic IP*, 351 F. Supp. 3d at 742. For example, the "determining" step requires determining "one or more deliverability metrics" based on the seed and subscriber deliverability data, without defining the deliverability metrics or explaining how the combination of seed and subscriber deliverability data enables the determination of deliverability metrics. ('356 patent at 12:25-27) Plaintiff acknowledges the claimed deliverability metric in the "determining" step is "broadly defined" and not specific. (8/23/2023 Tr.) But the Federal Circuit routinely rejects claims that are not "directed to 'a specific means or method' for improving technology" and are instead "simply directed to an abstract end-result." *RecogniCorp*, 855 F.3d at 1326 (quoting *McRO*, 837 F.3d at 1314).

Claim 1 similarly states that the "matching" step is achieved "by determining at the processor a list of matching IDs" associated with the seeded and subscriber campaigns. ('356 patent at 12:28-32) Nothing in the claim concretely describes how the matching IDs are generated. These method steps "are just the barebones description of a result. The claim

17

contains no description of any mechanism by which that result is obtained." *Epic IP*, 351 F.
Supp. 3d at 741.

Plaintiff's attempt to shift the focus to other limitations of claim 1 not captured by
Defendant's articulation is not persuasive. The omitted limitations provide additional details
about the seed and subscriber deliverability data without changing the character of the functional
steps. ('356 patent at 12:8-32); *see BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287
(Fed. Cir. 2018) (explaining that "a claim is not patent eligible merely because it applies an
abstract idea in a narrow way" to a particular type of data); *see also Elec. Power Grp.*, 830 F.3d
at 1354 (explaining that "a process of gathering and analyzing information of a specified content,
then displaying the results," is an abstract idea when it is not linked to "any particular assertedly
inventive technology for performing those functions.").

Plaintiff maintains that the facts of this case are most analogous to *TakaDu Ltd. v.
Innovyze, Inc.*, in which the court held that patent claims relating to methods and systems for
monitoring a water utility network were patent eligible and not abstract. C.A. No. 21-291-RGA,
2022 WL 684409, at *4 (D. Del. Mar. 8, 2022). The court determined that the claims were
directed to improved methods of monitoring utility networks that went beyond merely collecting,
analyzing, and displaying information in a particular field. *Id.* at *4-5. Instead, the claims taught
"a comparison between predicted and actual values to determine anomalous events" using
"improved computer systems that use specific modes of data analysis." *Id.* at *5. Because the
claims involved statistical analysis and manipulation of geographic information system data to
generate information that was not previously available, the court held that the recited systems
and methods could not be performed by a human. *Id.* at *6.

18

By contrast, the '356 patent lacks detailed teachings on how the deliverability metrics are determined or how the two data sets are matched. Claim 1 simply discloses combining two sets of known information. *See Eos Positioning Sys., Inc. v. ProStar Geocorp, Inc.*, C.A. No. 22-201-MN, 2023 WL 2709037, at \*5-6 (D. Del. Mar. 30, 2023) (distinguishing *TakaDu* because the patent in *Eos* claimed "human behaviors of gathering location data, marking the location on a map, and then displaying the map, rather than improvements in the technical operation of utility location."). And instead of reciting an improved computer system that uses specific modes of data analysis, as in *TakaDu*, the claims of the '356 patent require only a generic processor and storage databases with no claimed improvements. The '356 patent specification's discussion about the use of regular expressions to identify match patterns in the data is not shown to be an improvement to technology, it does not appear in the claims, and the Federal Circuit has recently rejected the notion that such a rule-based filtering policy overcomes the fact that the concept, at its core, is a method of organizing human activity. *See People.ai*, 2023 WL 2820794, at \*8.

For the foregoing reasons, the claims of the '356 patent are directed to an abstract idea, and the court proceeds to step two of the analysis.

## B.   *Alice* Step Two

Having determined that the claims of the '356 patent are directed to an abstract idea, the court next considers whether there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18. Here, the claims of the '356 patent contain no inventive concept that would otherwise transform the abstract idea of collecting and organizing data about email campaigns into a patent-eligible application of the abstract idea. *See Intellectual Ventures*, 838 F.3d at 1315 (stating that the use of "some

unspecified, generic computer" in which "each step does no more than require a generic

computer to perform generic computer functions" does not make an abstract idea patent eligible).

As previously discussed, the claims recite a generic "processor" and standard databases, and they

do not disclose any specific technological improvement or non-conventional computer. *See*

*Elec. Power Grp.*, 830 F.3d at 1354.

Assessed individually, the functional steps of claim 1 disclose receiving seed

deliverability data, receiving subscriber deliverability data, determining one or more

deliverability metrics, and matching a subscriber campaign to a seeded campaign using generic

storage databases and a processor.  ('356 patent at 12:5-32)  The patent does not disclose a

specific manner of performing these steps, and "[t]he invocation of generic computer technology

does not provide an inventive concept." *Mgmt. Sci.*, 510 F. Supp. 3d at 249; *see Elec. Power*

*Grp.*, 830 F.3d at 1355 (finding no inventive step where the claims did "not require any

nonconventional computer, network, or display components").  As previously discussed at §

III.A, *supra*, the functional limitations of the claims lack specificity.  The Federal Circuit has

explained that claims which "merely recite the method of implementing the abstract idea itself . .

. fail under *Alice* step two." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1012 (Fed.

Cir. 2018).

Considering the claimed steps as an ordered combination does not alter the result.

Plaintiff focuses on the fact that combining seed and subscriber deliverability data to determine

the success of an email campaign was unconventional.  (D.I. 13 at 11-12)  However, even if the

court assumes the claimed method is "[g]roundbreaking, innovative, or even brilliant," this alone

is insufficient to confer patent eligibility. *See Elec. Commc'n Techs. LLC v.*

*ShoppersChoice.com, LLC*, 958 F.3d 1178, 1182-83 (Fed. Cir. 2020) (quoting *SAP Am., Inc. v.*

20

*InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018)).  "[T]he novelty of any element or steps in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories[.]"  *Intellectual Ventures*, 838 F.3d at 1315 (emphasis in original; internal quotations and citations omitted).  For the reasons discussed at § III.A, *supra*, collecting two sets of data and organizing those data sets by matching IDs is abstract.  Where, as here, "the purported uniqueness of [the] claim . . . is itself abstract," the claim cannot pass muster under step one of *Alice*.  *Id.* at 1183; *Mgmt. Sci.*, 510 F. Supp. 3d at 250 ("The inventive feature . . . cannot be supplied by the abstract idea itself.").

Plaintiff contends that the step two analysis should be governed by the Federal Circuit's decision in *Amdocs (Israel) Limited v. Openet Telecom, Inc.*, which explained that the claim solved a technological problem regarding the size of the required databases, even though it did so using conventional components such as network devices and information gatherers.  841 F.3d 1288, 1300-02 (Fed. Cir. 2016).  The Federal Circuit determined that, when viewed as an ordered combination, the claim limitations "recite[d] an inventive concept through the system's distributed architecture," which reduced congestion in network bottlenecks while allowing the data to be accessible from a central location.[4]  *Id.* at 1300.  There is no similar improvement in computer functionality disclosed in the '356 patent.  The method of combining the two data sets, determining deliverability metrics, and matching the two data sets is not achieved through any particular configuration of the claimed processor.  *See Elec. Power Grp.*, 830 F.3d at 1355-56 ("The claims in this case specify what information . . . it is desirable to gather, analyze, and

---

[4] The Federal Circuit's "inventive concept" analysis in *Amdocs* turned on its prior construction of the term "enhance" as being dependent on the invention's distributed architecture.  *Amdocs*, 841 F.3d at 1300.  Here, Plaintiff has not suggested that the construction of any claim terms in the '356 patent is necessary to resolve Defendant's motion to dismiss.

display . . . but they do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by using anything but entirely conventional, generic technology."). The '356 patent discloses "the abstract idea of a solution to the problem in general" instead of "patenting a particular concrete solution to a problem." *Id.*

At oral argument, Plaintiff argued that paragraphs 32 to 35 and 42 of the complaint best articulate the technological solution to the technological problems set forth in the '356 patent for purposes of the step two inquiry. (8/23/2023 Tr.) But these portions of the pleading provide no greater clarity than the patent itself. (D.I. 1 at ¶¶ 32-35, 42) For instance, paragraph 42 of the complaint avers that the '356 patent offers improvements such as "allow[ing] senders to monitor one or more deliverability metrics based on subscriber deliverability data and seed deliverability data," which "allows for broader and more accurate monitoring of email campaigns than what was previously available[.]" (*Id.* at ¶ 42) The remaining paragraphs cited by Plaintiff do not clarify how the generic computer components are inventive and instead describe the desired result based on content in the specification. (*Id.* at ¶¶ 32-35)

The complaint characterizes various portions of the specification as reciting technological solutions to technological problems. (*See, e.g., id.* at ¶¶ 25, 28) But the cited portions of the specification do not support Plaintiff's position. Instead, these excerpts focus on the business problem of measuring the success of an email campaign and do not characterize the problem or the solution as technological in nature. ('356 patent at 1:31-38, 1:64-2:14) And for the reasons previously stated, neither the specification nor the claims articulate a specific technological solution to the problems identified in the patent. Even if the portions of the specification cited in the complaint disclosed an inventive concept, this is not enough to save the patent at step two of the analysis because the inventive concept must be found in the claims themselves. *See Two-*

*Way Media*, 874 F.3d at 1338 ("To save a patent at step two, an inventive concept must be evident in the claims."); *see also Ficep Corp. v. Peddinghaus Corp.*, 587 F. Supp. 3d 115, 126 (D. Del. 2022), *aff'd*, 2023 WL 5346043 (Fed. Cir. Aug. 21, 2023) (holding that expert's declaration did not create an issue of fact as to inventiveness at step two where the allegedly inventive limitation was not in the claims).

Dependent claims 2, 8, 13, and 19 fare no better at step two. "[A]dding a degree of particularity through additional limitations does not render dependent claims patent-eligible if the additional limitations merely add further insignificant details and do not convert otherwise patent-ineligible subject matter into a patent-eligible invention." *Epic IP*, 351 F. Supp. 3d at 750 (citing *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1264 (Fed. Cir. 2016)). Here, the recitation of a generic "plugin" configured to communicate with the recipient's email program in dependent claims 8 and 19 suffers the same problems as the generic "processor" in independent claim 1. ('356 patent at 12:50-52, 14:27-30) Likewise, achieving the matching function "by parsing a matching ID included in an email header," as disclosed in dependent claims 2 and 13, does not add an inventive concept. (*Id.* at 12:33-35, 14:8-11) As the Federal Circuit held in *People.ai*, claims reciting steps for parsing email data did not recite an inventive concept because the ordered combination of steps and filtering rules matched the steps traditionally performed by a human and were part of the abstract idea itself. 2023 WL 2820794, at *11-12. Because the dependent claims "represent merely generic data collection steps or siting the ineligible concept in a particular technological environment," they do not add an inventive concept. *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1349 (Fed. Cir. 2015).

23

Plaintiff suggests that the inventive concept inquiry raises disputed issues of fact and should therefore be reserved for summary judgment. (8/23/2023 Tr.)  Although the step two analysis "may involve disputes over underlying facts[,] like whether a claim element or claimed combination is in fact well-understood, routine and conventional to a skilled artisan at the time of the patent," the pleaded paragraphs cited by Plaintiff do not plausibly identify any such factual disputes.  (D.I. 1 at ¶¶ 32-35, 42); *Ficep Corp. v. Peddinghaus Corp.*, C.A. No. 19-1994-RGA-CJB, 2021 WL 254104, at *7 (D. Del. Jan. 26, 2021), *report and recommendation adopted*, 2021 WL 979564 (D. Del. Mar. 16, 2021).  Instead, both the complaint and the '356 patent claim elements, considered individually and as an ordered combination, recite "generic computer components employed in a customary manner, which is insufficient to transform an abstract idea into a patent-eligible invention."  *WhitServe LLC v. Donuts Inc.*, 390 F. Supp. 3d 571, 579-80 (D. Del. 2019) (quoting *Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*, 703 F. App'x 986, 990 (Fed. Cir. 2017)).  Allegations that subscriber and seed deliverability data had never previously been used in combination may suggest that the '356 patent is not obvious, but this is not enough to show an inventive concept.  *See SAP*, 898 F.3d at 1163; *Intellectual Ventures*, 838 F.3d at 1315.  Because it is apparent from the face of the '356 patent that the claims are not directed to eligible subject matter, resolving the § 101 inquiry at the pleading stage is appropriate in this case.  *See Fast 101 PTY Ltd. v. Citigroup Inc.*, 424 F. Supp. 3d 385, 389 (D. Del. 2020) (citing *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)).

### C.    Representative Claim Analysis

The parties dispute whether claim 1 is representative of the claims in the '356 patent. Defendant argues that claim 1 is representative of all other claims in the '356 patent, noting that claims 2-10 depend on claim 1 without adding significant technological limitations, claims 11

and 12 are comparable to claim 1, and claims 13-21 are dependent on claim 12.  (D.I. 10 at 19-20)  Plaintiff only specifically identifies dependent claims 2, 8, 13, and 19 as non-representative, alleging that the dependent limitations change the focus of the claim to something other than the abstract idea recited in claim 1.  (D.I. 13 at 21)

Claim 1 is representative of the claims of the '356 patent.  The Federal Circuit has held that "[c]ourts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim[.]"  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  Here, Plaintiff does not present any argument challenging Defendant's assertion that claim 1 is representative of claims 3-7, 9-12, 14-18, or 20-21.  Moreover, the court has separately considered the eligibility of dependent claims 2, 8, 13, and 19 and determined that these claims recite the same central, abstract concept of collecting and organizing data about marketing campaigns.  *See* §§ III.A-B, *supra*.  The minor differences in claims 2, 8, 13, and 19 do not change the focus of those claims to anything beyond the abstract idea in claim 1.  *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013) (explaining that claims "should rise or fall together" despite minor differences in terminology when they require performance of the same basic process).

Plaintiff argues that claim 1 of the '356 patent is not representative, citing the prosecution history in which the PTO distinguished between claims that could and could not be performed mentally.  (D.I. 13 at 21)  For the reasons stated at § III.A, *supra*, however, the court gives no weight to the prosecution history of the '356 patent.  Plaintiff's briefing does not identify any limitations in the remaining claims that are relevant to the § 101 inquiry, and at oral argument,

Plaintiff acknowledged that the plugin recited in claims 8 and 19 is not described in significant detail. (*Id.* at 21-22; 8/23/2023 Tr.)

### D.   Leave to Amend

As previously stated at § III.B, *supra*, it is well-established that the court may dismiss a case under § 101 on a Rule 12(b)(6) motion to dismiss. *See Cleveland Clinic*, 859 F.3d at 1360 ("[W]e have repeatedly affirmed § 101 rejections at the motion to dismiss stage[.]"). This is particularly true where, as here, the plaintiff does not identify any claim terms requiring construction. *Id.* A district court may decide a motion to dismiss under § 101 before claim construction "if the nature of the claims is clear and it is apparent that claim construction would not affect the patent-eligibility of the claims at issue." *Id.* at 752 (citing *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012)).

Plaintiff has not identified any claim terms that could give rise to a material dispute over claim construction. *See Genetic Techs.*, 818 F.3d at 1374. The claims of the '356 patent are not highly technical and recite only basic, conventional components. Also, for the reasons stated at § III.B, *supra*, the "inventive concept" inquiry at step two does not raise fact issues that would otherwise preclude dismissal. Consequently, dismissal at this stage of the proceedings is appropriate.

Plaintiff asks the court to dismiss without prejudice to amend, should the court be inclined to grant Defendant's motion. (D.I. 13 at 22) In support of the request, Plaintiff argues that amendment would not be futile because it "can supply additional facts demonstrating patent eligibility, including additional allegations regarding inventive concepts, the prosecution history, and dependent claims." (*Id.*)

Here, leave to amend would be futile due to the fundamental deficiencies in the asserted claims themselves. "The claims of the patent[ ] say what they say," and "[a]mending the complaint would not change the Court's § 101 analysis." *Wireless Discovery LLC v. eHarmony, Inc.*, --- F. Supp. 3d ----, 2023 WL 1778656, at *11 (D. Del. Feb. 6, 2023) (granting motion to dismiss for failure to state a claim based on a § 101 analysis and denying leave to amend the complaint); *see also Recentive Analytics, Inc. v. Fox Corp.*, C.A. No. 22-1545-GBW, 2023 WL 6122495, at *13 (D. Del. Sept. 19, 2023) (same); *Realtime Data LLC v. Array Networks Inc.*, 556 F. Supp. 3d 424, 435-37 (D. Del. 2021) (reaffirming prior dismissal under § 101 without leave to amend where "the line . . . is clear, and the asserted claims do not have the specificity required of a technical solution" and "the patentee sought and received claims on the ideas themselves."). Allegations that the invention is unconventional "do[ ] not mean that the claims necessarily incorporate an 'inventive concept,'" and "the 'inventive concept' cannot be the abstract idea itself." *Epic IP*, 351 F. Supp. 3d at 751.

**VI.    CONCLUSION**

For the reasons set forth above, Defendant's motion to dismiss (D.I. 9) is GRANTED with prejudice. An Order consistent with this Memorandum Opinion shall issue.

Dated: September 22, 2023

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE